UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-14093-CIV-MAYNARD

3 NATIVES FRANCHISING, LLC,

    Plaintiff,

v.

3 NATIVES STUART, LLC,
MARY MILLER,
CITY BEETS, LLC,
MICHAEL MCLAUGHLIN, AND
EMILY IRWIN,

    Defendants.
_____/

## ORDER ON PENDING MOTIONS (DE 8, 24 & 37)

**THIS CAUSE** comes before this Court upon the Plaintiff's Amended Motion for Temporary Restraining Order and/or Preliminary Injunction (DE 24) and the two Motions for Hearing (DE 8 and 37). Having reviewed the Motions and the Defendants' Response to the Amended Motion for injunctive relief, noting that the Plaintiff filed no Reply, this Court finds as follows:

## BACKGROUND

    1.    This case concerns a failed franchise relationship. The Plaintiff is the franchisor. It owns the "3 Natives" juice cafe franchise. It licensed the right to operate a "3 Natives" juice cafe in Stuart, Florida to "3 Natives Stuart, LLC", the franchisee. Mary Miller signed the Franchise Agreement as the corporate manager of 3 Natives Stuart LLC and as its guarantor. The Franchise Agreement that created that franchise relationship either was rescinded (according to the Defendants) or terminated (according to the Plaintiff). Each side blames the other for breach

of contract. The Plaintiff-franchisor came to court first, suing the Defendant-franchisee and those associated with it.

2. The Franchise Agreement that underlies this lawsuit is found at DE 19—1. One of that contract's primary concerns is the protection of the Plaintiff-franchisor's intellectual property assets (trademarks, proprietary information, trade secrets, trade dress, reputation, and goodwill). The contract refers to the Plaintiff's "System" as the term that summarizes that total collection of intellectual property assets. The proprietary "System" that the contract seeks to protect concerns "the establishment, development and operation of" the franchise; its offering of premium smoothies, juices, and other light food items based on proprietary recipes; maintenance of uniform standards, policies, and procedures; and so forth. In the contract the Plaintiff-franchisor represents that it has developed its comprehensive franchise "System" "through significant expenditures of time, skill, effort and money".

3. This Court recounts the history of the negotiations for and the parties' experience with the Stuart cafe for context and background. This Court draws that history from what is pleaded in the Amended Complaint, the Motion and Response, and the various attachments thereto including affidavits from the relevant parties. For ease of reference, this Court refers to "the Defendants" in the plural, consisting of the principal Defendant, 3 Natives Stuart, LLC, who is the franchisee (the party who entered the Franchise Agreement) and Defendant Mary Miller who signed the Franchise Agreement as guarantor. Because they are the parties to the contract, they are the principal Defendants who are defending against the Plaintiff's request for injunctive relief and hence the principal Defendants who are subject of the below discussion.

4. The "3 Natives" franchise has grown from a single cafe in Tequesta, Florida, and the franchise company is still based there. That first cafe opened in 2013, roughly three years

before the Defendants opened their cafe in Stuart. As of the time of this lawsuit, the Plaintiff claims the existence of twelve cafes in total from Palm Beach County to Tallahassee, with five more planned to open in Florida and Texas. In early 2016 the Plaintiff (through a sibling LLC) obtained trademark registration for the name "3 NATIVES" and for the circular graphic design that incorporates that name into a palm tree drawing above the words "raw-natural-fresh". Those two trademark registration documents are at DE 19—2.

5. Mary Miller is the owner of a health club gym in Stuart, Florida, and her cousin, Michael McLaughlin, manages it. Mr. McLaughlin asked Phillip Bambino, the owner and managing member of 3 Natives Franchising LLC, if someone was interested in opening a "3 Natives" cafe inside their gym. Rather than bring in an independently operated cafe, Mr. Bambino suggested that the Defendants become franchisees which he said would be the more financially advantageous to them. He made various representations about the franchise's financial performance to-date and the expected financial performance of the Defendants' cafe. He also stressed the practical advantages of the franchise's already established "System" and food commissary. Those two factors were key to the Defendants' decision to become a "3 Natives" franchisee because they had no food service experience of their own. The Defendants' plan was to rely on the Plaintiff for that support.

6. The parties signed the Franchise Agreement on April 29, 2016. The Defendants paid $30,000 and agreed to pay a monthly 6% gross revenue royalty fee. The contract gave the Plaintiff various inspection and accounting rights. The Defendants agreed to abide by the Plaintiff's operating standards and to protect its "System" of proprietary information. The Defendants agreed to restrictive covenants such as a non-compete agreement. The contract had a ten year term.

7. In sharp contrast to how the Franchise Agreement describes the Plaintiff's well-developed "System", in practice the Plaintiff gave them very little support in setting up and operating the cafe, the Defendants complain. What information they did receive was of no true proprietary value. They were left to figure everything out on their own. After Mr. Bambino had received payment of the fee and had set up the point-of-sale system to ensure notification of all sales activity, he no longer was in touch. The Plaintiff never inspected the Defendants' premises or lease arrangement. The Plaintiff did not complaint about the cafe's lack of a dedicated telephone line; instead the cafe shared the gym's already existing telephone line.

8. They were left to figure out on their own how to physically construct and build out the cafe space, the Defendants complain. They received no substantive training. The Plaintiff's operating manuals conveyed no helpful or proprietary information. The manuals were brief and offered nothing more than generally known business information. There was no proprietary food preparation information; the Defendants taught themselves how to prepare the food. The contract bound the Defendants to vendors and suppliers who overcharged them for commonly available products that they could have sourced more cheaply on their own. What operational advice they did receive was unhelpful. What food recipes and food preparation techniques that the Plaintiff did give them were unpopular with customers. The Defendants had to figure out how to implement the marketing strategy on their own and had to pay for it out of their own pocket.

9. Several key features of the franchising arrangement upon which the Defendants had relied did not pan out as anticipated. For one, they had hoped for the help of Allan Turner who at the time managed the franchise's flagship cafe. The Defendants were so dependent on Mr. Turner for operational help that they gave him equity in their business. Three weeks before

the Defendants opened their cafe, the Plaintiff fired Mr. Turner. Afterwards Mr. Turner came to the Defendants to inform them that the Plaintiff had threatened him and that he could not work for the Defendants as planned. In Mr. Turner's place, the Plaintiff sent another one of its employees. As the Defendants put it, Mr. Turner's replacement "proved to be unfit to manage a 3 Natives Cafe". Secondly, the Plaintiff stopped offering its commissary service whereby it delivered already prepared menu items to franchisees' cafes. The loss of that service forced the Defendants to build a food preparation area at substantial expense and inconvenience to their gym business.

10. A third key term was the "protected territory" of the Defendants' Stuart cafe that they specially had negotiated with the Plaintiff. It prevented any competing "3 Natives" cafe from opening within the city limits of Stuart and Palm City. Nevertheless, in June 2018, the Plaintiff allowed a franchisee to open a "3 Natives" cafe in Palm City and did so without forewarning. Not only do the Defendants allege a breach of the parties' "protected territory" agreement (formalized as Exhibit A to the Franchise Agreement), but opening the competing cafe harmed the Defendants' business just as Mr. Bambino had conceded would happen. The Defendants identify specific ways in which the Palm City "3 Natives" cafe harmed its cafe. First, the competing Palm City cafe benefitted from the marketing that the Defendants already had undertaken (and paid for) in the Palm City area. Second, the Palm City cafe "cannibalized" the Defendants' sales, causing the Defendants' income to decrease. Third, the Defendants had to handle the complaints from customers of the poorly-run Palm City cafe. Customers assumed that the Defendants were responsible for it, too. Fourth, the Plaintiff became even less attentive to the Defendants after it had opened the competing (and allegedly contract-breaching) Palm City cafe.

11. The Plaintiff alleges in turn that the Defendants breached the Franchise Agreement's non-compete restrictive covenant. The Plaintiff alleges that Defendants Miller and McLaughlin incorporated a new business entity, "City Beets LLC", whose street address is the same as 3 Natives Stuart, LLC's. The Plaintiff alleges that Ms. Miller and Mr. McLaughlin formed City Beets LLC as part of scheme to hide revenue and to compete with the "3 Natives" franchise. The Plaintiff further complains that the Defendants sent them no financial statements for 2018 and first quarter of 2019.

12. The Defendants explained their reason for withholding that information and for withholding royalty fee payment in the rescission demand letter that they sent to the Plaintiff on February 12, 2019. The Defendants proffer that letter at pages 25—29 of DE 14—1. In that letter (which curiously the Plaintiff does not mention in its pleadings) the Defendants complained about the Plaintiff's failure to meet expectations and its breaches of the Franchise Agreement. The Defendants asserted common law fraud, breach of contract, promissory estoppel, unjust enrichment, and violations of Florida statutory law as legal theories which would give them redress for the Plaintiff's conduct. The Defendants claimed $175,417.49 in damages. The Defendants also were under the legal obligation to mitigate their damages, they asserted. That was why the Defendants felt compelled to convert the 3 Natives Stuart LLC cafe into a new business, as they explained to the Plaintiff in the letter. The Defendants ended their rescission letter by offering the Plaintiff an alternative. If the Plaintiff did not want the Defendants to reconstitute the cafe, then the Plaintiff simply could take the Stuart cafe over from them. The Defendants gave the Plaintiff a deadline of February 18 to answer. Should the Plaintiff not answer, then the Defendants would "reestablish a similar business at the same location commencing on Monday, March 1, 2019."

13. Mr. Bambino came to the Stuart cafe on February 13, 2019 (after a heretofore long absence, the Defendants emphasize). The Defendants allege that Mr. Bambino and his companion acted aggressively toward the cafe manager. Feeling intimidated, the cafe manager called Mr. McLaughlin and Ms. Miller. Ms. Miller in turn called the police. Mr. Bambino left before the police arrived.

14. On February 19, 2019 the Plaintiff sent the Defendants a Notice of Default. That Notice is not of record. Instead the Plaintiff discusses it at ¶39 of its Amended Complaint (DE 19). There, the Plaintiff justifies its termination of the Franchise Agreement because of the Defendants' non-payment of royalties; their failure to provide annual financial statements for 2018 and for the first quarter of 2019; and their failure to provide other requested financial information. The Plaintiff cites the Defendants' failure to pay suppliers in-full and on-time and their use of unapproved products and suppliers. Lastly the Plaintiff cites the Defendants' act of "calling the police during a routine inspection allowed under Section 6.R".

15. Evidently, as Mr. McLaughlin reports at ¶89 of his Declaration (DE 14—1), the Plaintiff conducted a second inspection on February 20th. Mr. McLaughlin says that Mr. Bambino again acted aggressively and again the police were called. This time a police report was written. The Plaintiff does not mention that particular incident, however. Instead it recalls conducting a follow-up inspection on March 1, 2019.

16. Regardless of when those inspection(s) took place, on March 5, 2019 the Plaintiff sent the Defendants a formal Notice of Termination. In that letter the Plaintiff lists out its inspection findings including instances of improper food handling and use of outside vendors. (The Defendants characterize the purported offenses that the Plaintiff lists out as either false; immaterial and insignificant; or actually contract-compliant.) On the basis of the listed defaults,

the Plaintiff invoked all of its termination rights under the Franchise Agreement including demanding immediate cessation of all propriety, trademark, trade dress, etc., of the "3 Natives" "System". The Defendants say that on the same day they received the termination letter, they ceased using all "3 Natives" intellectual property. There were no manual hard copies to return to the Plaintiff. There was no dedicated telephone line to re-assign.

17. Implicitly corroborating that the Defendants indeed did cease all "3 Natives" operations, the Plaintiff accuses the Defendants of putting into action their preconceived plan to operate "City Beets" as their new business. The Plaintiff complains that the Defendants' operation of the City Beets business still violates the contract's non-compete covenant. The Plaintiff complains that the "City Beets" business also infringes on some of its propriety and intellectual property. City Beets operates out of the same physical space, and it uses the same furniture and juice-pressing equipment that the Defendants used for their "3 Natives" cafe. It offers a substantially similar menu, and some of the food that it serves comes from its approved vendors including from one vendor with whom the Plaintiff has an exclusive relationship. The Plaintiff complains that City Beets is based on its proprietary "System" (including training and know-how).

18. The Defendants also complain that the Defendants used its trademarks and franchise name to market City Beets on the internet. The Defendants deny any wrongful infringement. At page 16 of DE 14—1, Mr. McLaughlin attests that it closed down all of 3 Natives Stuart LLC's social media accounts within the 30-day post-termination period that the Franchise Agreement permits. Within that permitted time frame, the Defendants posted to some social media accounts a notice that was limited to announcing their "3 Natives" Stuart cafe as now "permanently closed" and to inviting the public to check out City Beets which "has the

same great staff, amazing acai bowls, smoothies, and juices." Mr. McLauglin furthers that the Plaintiff locked the Defendants out of 3 Natives Stuart LLC's email accounts. As for any results that search engines might give for the now closed 3 Natives Stuart LLC, the Defendants deny having any control over that.

19. On March 13, 2019 a representative of the Plaintiff visited the now reconstituted "City Beets" cafe. The representative took photographs of alleged infringement of its trademarks and other proprietary information. These show use of the same furniture. They show menu items that are substantially similar to its as well as products that its approved vendors supply. The Plaintiff adds the allegation that it observed City Beets selling juices without printed paper labels in violation of health codes.

20. In its Amended Complaint (DE 19) the Plaintiff sues the Defendants for a wide range of causes of action: unlawful use of intellectual property, wrongful competition, breach of contract, and equitable quasi-contractual theories of relief. However all of those causes of action concern the Franchise Agreement contract. In addition to the principal Defendants (the franchisee, 3 Natives Stuart LLC, and its guarantor, Mary Miller), the Plaintiff sues City Beets LLC, Michael McLaughlin, and Emily Irwin. Although expressed through different theories of relief, the common denominator is the Franchise Agreement contract. The Plaintiff likewise seeks one common form of relief: enforcement of all of the contract's terms and restrictive covenants. To achieve that, the Plaintiff asks this Court to enjoin the Defendants, through both a permanent injunction and in the meantime temporary and preliminary injunctions.

21. Before this Court is the Plaintiff's request for temporary and preliminary injunctions. To begin with, the Plaintiff's request for an ex parte temporary restraining order pending determination of its preliminary injunction request is moot. The Defendants have

appeared in this case, and the Plaintiff's request for injunctive relief now is fully briefed. Therefore only the preliminary injunction request need be considered. Having undertaken that consideration, this Court finds for the reasons it explains below that the Plaintiff does not meet the standard for enjoining the Defendants now, on a preliminary basis. The question of whether the Plaintiff is entitled to injunctive relief will have to be answered later after a determination of the merits of the Plaintiff's causes of action and the Defendants' defenses.

## **DISCUSSION**

22.     This Court draws the standard for what the Plaintiff must demonstrate in order to obtain a preliminary injunction against the Defendants from <u>St. Lucie Jewelry, Inc. v. Jewelry Mgt. Servs., LLC</u>, 2013 WL 12094853 (S.D.Fla. 2013) and <u>Oculus Optikgerate, GmbH v. Insight Instruments, Inc.</u>, 2012 WL 12868709 (S.D.Fla. 2012) and the case law cited therein. This Court discusses the four required elements in turn below. This Court adds that it is the Plaintiff's burden of proof to justify the need for a preliminary injunction. Not only that, the Plaintiff must "clearly" meet its burden of proof. That is because a preliminary injunction is an extraordinary and drastic remedy; granting a preliminary injunction is the exception rather than the rule. <u>See</u> <u>also</u>, <u>Lucky Cousins</u>, <u>IDMWORKS</u>, <u>AutoNation</u>, and <u>Pirtek</u>, <u>infra</u>.

23.     The first required element is a substantial likelihood of success on the merits. In their Response the Defendants make a persuasive argument for why the Plaintiff falls short of meeting this element. This Court begins with the non-compete and related restrictive covenants incorporated into the Franchise Agreement and the various claims for relief that the Plaintiff bases on it. This Court draws the governing Florida law on the matter from the case law cited in the next paragraph. Generally speaking, Florida law enforces a restrictive covenant, such as a non-compete agreement, only if it is reasonable and protects legitimate business interests. The

restrictive covenants at issue here in this case, the Defendants argue, fail that test. This is because the Plaintiff identifies no specific intellectual property or other proprietary asset in need of protection. Instead the Plaintiff's claims of such are all conclusory. Moreover the Defendants deny receiving any proprietary information from the Plaintiff. What the Plaintiff is trying to accomplish here is simply to put the Defendants out of business, the Defendants retort, but Florida law does not enforce restrictive covenants for the purpose of constraining ordinary marketplace competition.

24.     The case of Pirtek USA, LLC v. Wilcox, 2006 WL 1722346 (M.D.Fla. 2006) is directly on point and supports the Defendants' argument. Pirtek found insufficient legitimate business interests in the plaintiff's franchise "system" to justify enjoining the defendant-franchisee's compliance with the franchise agreement's non-compete covenant. See also, IDMWORKS, LLC v. Pophaly, 192 F.Supp.3d 1335 (S.D.Fla. 2016) (declining to enjoin the defendant-employee's compliance with the restrictive covenants of the employment contract after finding insufficient business interests in need of protection) and AutoNation, Inc. v. O'Brien, 347 F.Supp.2d 1299, 1304 (S.D.Fla. 2004) (stating the general rule that "information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to [preliminary injunction] protection."). See also, Passalacqua v. Naviant, Inc., 844 So.2d 792 (Fla. 4th DCA 2003) and Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc., 870 So.2d 111 (Fla. 2nd DCA 2004) (likewise declining to enjoin on a preliminary basis the defendants' compliance with restrictive covenants because the plaintiffs failed to demonstrate sufficient business interests to justify such protection under Florida law).

25.     In any event the Plaintiff waived its right to enforce the non-compete and related restrictive covenants. The creation of the competing "3 Natives" franchise in Palm City not only

directly violated the Franchise Agreement, the Defendants complain, but it ran contrary to the need to avoid competition between "3 Natives" franchisees, a need that Mr. Bambino, himself, had conceded. Because the Plaintiff allowed the competing Palm City franchisee to open, it may not now enforce the non-compete covenant against them, the Defendants reason. In addition to opening the competing Palm City cafe, the Defendants complain of various other ways in which the Plaintiff breached the Franchise Agreement first. If the Plaintiff indeed had breached the Franchise Agreement first, then that raises the question of how its initial breach of the contract affects its ability to compel the Defendants' compliance.

26. This Court notes the above countervailing points because to secure its requested preliminary injunction, the Plaintiff not only must demonstrate the likelihood of success on the prima facie elements of its claims for relief, but it also must demonstrate a substantial likelihood of prevailing over the Defendants' defenses to them. See Lucky Cousins Trucking, Inc. v. QC Energy Resources Texas, LLC, 223 F.Supp.3d 1221 (M.D.Fla. 2016). The Lucky Cousins decision, in which the court declined to enjoin the defendant's compliance with the restrictive covenants of the parties' contract, supports the Defendants' position here. The plaintiff had yet to overcome at the preliminary injunction stage the defendant's defense that it was the plaintiff who had breached the contract first, who had hindered the defendant's ability to perform under the contract, and who was seeking the contract's enforcement with unclean hands. (Also, the Lucky Cousins court found insufficient business interests to justify enforcement of the restrictive covenants, similar to the finding that this Court reaches above.)

27. Consequently this Court finds that the Plaintiff does not demonstrate a substantial likelihood of success of prevailing on its contract-based claims for relief. The Plaintiff's claims for relief that concern the Franchise Agreement contract are those to compel the Defendants'

compliance with non-compete and related restrictive covenants as well as for breach of contract (for breaching those restrictive covenants as well as for the non-payment of royalty fees and for Defendant Millers' liability under her personal guaranty commitment).

28. This Court finds that the Plaintiff fails to demonstrate a substantial likelihood of success on the merits of its remaining causes of action, too. Those remaining causes of action directly or indirectly concern the confidential, proprietary, and trademarked assets over which the Plaintiff asserts ownership. The Plaintiff alleges that the Defendants have made use of its intellectual property assets unlawfully, and the Plaintiff expresses that core grievance through the different theories of trademark infringement, theft of confidential and proprietary assets, and unfair competition.

29. Because they long since have ceased any infringing conduct, these remaining claims of relief are moot, the Defendants argue. Even the Plaintiff's own allegations show no <u>ongoing</u> infringement of its two "3 Natives" trademarks, for example. Likewise the Plaintiff pleads no other ongoing intentional acts by the Defendants that would cause consumers to confuse the City Beets cafe with the "3 Natives" franchise. By the Plaintiff's own allegations, the Defendants since have distanced themselves from the Plaintiff's "3 Natives" franchise rather than create false associations with it. Lastly the Defendants argue persuasively that the Plaintiff's claimed "trade dress" and "trade secrets" are too conclusory to show a substantially likelihood of prevailing on those particular claims for relief. The Defendants further that there is nothing inherently distinctive about the "3 Natives" franchise's food or food service to justify enjoining the Defendants from operating its "City Beets" juice cafe. Nor does the Plaintiff proffer any actual instance when a customer confused the new "City Beets" cafe with either the former "3 Natives" Stuart cafe, specifically, or with the "3 Natives" franchise, generally. This Court agrees

with the Defendants and finds an insufficient likelihood of success. The St. Lucie Jewelry decision, cited above, likewise finds a plaintiff's claims of trademark infringement, unfair competition, and the like to be too general and unsubstantiated to warrant preliminary injunctive relief.

30. This Court therefore finds that the Plaintiff does not demonstrate at this early stage in the litigation process a substantial likelihood that it will prevail on any of its claims for relief whether based on the contract, intellectual property, or unfair competition. That is not to say that the Plaintiff will not prevail ultimately at the litigation's conclusion. The Plaintiff still might prevail after further development of its case-in-chief. However the "Plaintiff cannot obtain a preliminary injunction by merely proving the possibility of success, which is all it has established." IDMWORKS, LLC, 192 F.Supp.3d at 1339 (emphasis added).

31. The Plaintiff's failure to meet the "likelihood of success" element obviates the need to consider the remaining three elements. Nevertheless, for the sake of thoroughness, this Court discusses them, too.

32. The second element that the Plaintiff must establish is "irreparable injury". That is, that it will suffer irreparable injury unless the injunction issues. To satisfy this requirement, the harm at issue must be "actual and imminent, not merely remote or speculative." Lucky Cousins, 223 F.Supp.3d at 1226 (internal citations omitted). The harm that the Plaintiff reports is conclusory and abstract in nature, however. The Plaintiff identifies no specific harm for which only an immediate injunction can provide relief. Moreover the harm must truly be irreparable. That is, the harm must be beyond what the available range of remedies that the law provides such as compensatory monetary damages can correct. See Rey v. Guy Gannett Publ'g Co., 766 F.Supp. 1142, 1147—48 (S.D.Fla. 1991). The Plaintiff fails to show how the available remedies

at law are inadequate in this case. As also explained in the Oculus Optikgerate decision, cited above, "the dispute underlying the instant injunction request is inherently a contractual, business dispute" for which "money damages are sufficient to redress any harm that the Defendant's entry into the marketplace in competition with the Plaintiff may cause pending resolution of the litigation." Id. at *3. The Pirtek decision, rendered in the context of a failed franchise relationship, succinctly explains at page *4 why the Plaintiff fails to meet the second element here, even with respect to its claims for relief that are based on the restrictive covenants in the Franchise Agreement contract. The Plaintiff's claim of ongoing harm---either from the breach of the restrictive covenants or from the other kinds of infringing or competitive conduct alleged--- are speculative. Any such harm to the Plaintiff, whether suffered in the past or ongoing, is redressable at law, moreover.

33. The third element for the entry of a preliminary injunction looks at the harm from the Defendants' perspective. The third element requires the Plaintiff to show that the harm that the Defendants' ongoing actions are causing it outweighs the harm that its requested injunction may cause the Defendants. This Court notes that there is little to no ongoing unlawful or violative conduct by the Defendants to enjoin in the first place. To this extent the third element is a moot point. To the extent that the Plaintiff seeks to enjoin the Defendants to close their City Beets cafe pending the outcome of this litigation, the requested injunction would impose a harm on the Defendants that does outweigh, to a substantial degree, the conclusory and abstract harms that the Plaintiff claims that the City Beets cafe is causing it. The Plaintiff therefore fails to meet the third element.

34. The fourth, and final, element requires the Plaintiff to show how its requested injunction serves the public interest. The Plaintiff asserts the public's general interest in the

enforcement of contracts including restrictive covenants. However the particular circumstances of this case invoke the public's countervailing interest in open marketplace competition. Because it remains unclear at this early stage in the litigation what legitimate and enforceable contractual rights the Plaintiff has with which to restrain the Defendants' business, the Plaintiff fails to satisfy the fourth element.

35. In their Response (DE 14) the Defendants provide a thorough fact review and legal analysis to rebut the Plaintiff's request for injunctive relief. This Court finds the Defendants' opposition to the Plaintiff's Motion persuasive and incorporates their reasoning into this Discussion. Moreover, this Court notes, the Plaintiff did not reply to the Defendants' Response.

36. Lastly this Court sees no need for an evidentiary hearing. This Court sees no dispute of fact or credibility determination that is dispositive to deciding whether the Plaintiff demonstrates the need for a preliminary injunction. As emphasized above, a preliminary injunction is an extraordinary form of relief. The Plaintiff falls short of meeting that exacting standard even after accepting its averments as true. To clarify, the issue here is limited solely to whether there is need for an evidentiary hearing on this particular Motion and whether the Plaintiff meets the standard for enjoining the Defendant on a preliminary basis. The merits of the Plaintiff's claims for relief and whether the Plaintiff actually will prevail on its Amended Complaint is not at issue at this early stage in the litigation process.

## **CONCLUSION**

37. The Plaintiff fails to justify the entry of a preliminary injunction against the Defendants. As this Court concluded in <u>Oculus Optikgerate</u> and <u>St. Lucie Jewelry</u>, cited above, the denial of the requested preliminary injunction is no comment on the ultimate merits of the

Plaintiff's case. Instead it is just that the particular circumstances of this case, where each side accuses the other of breaching the contract and where there are insufficiently developed business interests at stake, do not lend themselves well to the entry of preliminary injunctive relief. Nor does the instant ruling foreclose redress for any harm that the Defendants' ongoing actions may be causing the Plaintiff pending the case's final resolution. Should the Plaintiff ultimately prevail, the Defendants may be liable for damages and other forms of corrective and compensatory relief.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Amended Motion for Temporary Restraining Order and/or Preliminary Injunction (DE 24) and the Motions for Hearing (DE 8 & 37) thereon are all **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 13th day of August, 2019.

_____
SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE